UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHN P. HAINES, individually and on
behalf of all others similarly situated,

        Plaintiff,

v.                                                                    Case No. 8:19-cv-2995-KKM-AEP

FIDELITY NATIONAL TITLE OF
FLORIDA, INC.,

        Defendant.

_____/

## **REPORT AND RECOMMENDATION**

Plaintiff John P. Haines ("Haines") initiated this action in state court, asserting claims on behalf of himself and all other individuals similarly situated against Defendant Fidelity National Title of Florida Inc. ("Fidelity") for gross negligence, negligence, breach of fiduciary duty, declaratory judgment, and unjust enrichment and seeking to proceed as a class action (Doc. 1-3). Following removal, Haines sought to proceed on an Amended Complaint (Doc. 4) and now on a Second Amended Complaint (Doc. 43), wherein Haines asserts claims on behalf of himself and all other individuals similarly situated against Fidelity for gross negligence, negligence, breach of fiduciary duty, and unjust enrichment. Currently before the Court is Haines's Motion for Class Certification (Doc. 77), Fidelity's response in opposition thereto (Docs. 81-85), Haines's reply (Doc. 87), and Fidelity's sur-reply (Doc. 96). Primarily, Haines seeks to certify a class comprised of buyers in a

residential contract for sale and purchase in the State of Florida who selected an option provision of the contract indicating that the seller will pay specified closing costs but who then were allocated and paid some closing costs.  Fidelity opposes certification of the class.  After consideration, it is recommended that Haines's Motion for Class Certification (Doc. 77) be denied.[1]

## I.    Background

In June 2019, Haines and his partner, with the assistance of a real estate broker, entered into a real estate purchase and sale contract (the "Contract") to buy property, under which Haines was deemed the "Buyer" and the owners of the property were deemed the "Seller" (Doc. 77, Ex. A, Contract).  To memorialize this transaction, Haines and the Seller used a standardized form known as the "'AS IS' Residential Contract for Sale and Purchase" approved by the Florida Bar and Florida Association of Realtors (the "FARBAR").  Pursuant to the terms of the Contract, Plaintiff agreed to pay cash for the property at closing (Doc. 77, Ex. A, Contract, ¶8(a)).

With respect to the allocation of closing costs, Paragraph 9 of the Contract indicates:

**9.    CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS**
**(a)    COSTS TO BE PAID BY SELLER:**

***

- Owner's Policy and Charges (if Paragraph 9(c)(i) is checked)

---

[1]    This matter was referred to the undersigned for issuance of a Report and Recommendation.  *See* 28 U.S.C. § 636.

2

**(c)** **TITLE EVIDENCE AND INSURANCE:** At least ___ (if left blank, then 15, or if Paragraph 8(a) is checked then 5) days prior to Closing Date ("Title Evidence Deadline"), a title insurance commitment issued by a Florida licensed title insurer, with legible copies of instruments listed as exceptions attached thereto ("Title Commitment") and, after Closing, an owner's policy of title insurance (see STANDARD A for terms) shall be obtained and delivered to Buyer. If Seller has an owner's policy of title insurance covering the Real Property, a copy shall be furnished to Buyers and Closing Agent within 5 days after Effective Date. The owner's title policy premium, title search and closing services (collectively, "Owner's Policy and Charges") shall be paid, as set forth below. The title insurance premium charges for the owner's policy and any lender's policy will be calculated and allocated in accordance with Florida law, but may be reported differently on certain federally mandated closing disclosures and other closing documents. For purposes of this Contract, "municipal lien search" means a search of records necessary for the owner's policy of title insurance to be issued without exception for unrecorded liens imposed pursuant to Chapters 159 or 170, F.S., in favor of any governmental body, authority or agency.

**(CHECK ONE):**

___**X**___ (i)  Seller shall designate Closing Agent and pay for Owner's Policy and Changes and Buyer shall pay the premium for Buyer's lender's policy and charges for closing services related to the lender's policy, endorsements and loan closing, which amounts shall be paid by Buyer to Closing Agent or such other provider(s) as Buyer may select; …

(Doc. 77, Ex. A, Contract, ¶9(a) & (c)(i)).  Haines alleges that, under this provision,

the Seller's title policy premium, title search, and title agent closing services were to

be charged to either the Buyer or Seller consistent with the terms of the Contract.

According to Haines, having checked Paragraph 9(c)(i), Haines and the Seller

agreed that the Seller would designate the Closing Agent and that Haines would

pay for his lender's policy and charges for closing services related to the lender's

policy, endorsements, and loan closing if Haines financed the transaction with a

lender.  Since Haines purchased the property with cash and, hence, no lender, Haines contends that he did not incur any loan or title agent closing fees, title policy premiums, or lender endorsements such that he should not have been charged a fee by a Closing Agent.

To facilitate the closing of the real estate transaction, the Seller designated Fidelity as the Closing Agent to handle the procurement of title insurance and to perform Closing Services.[2]  Though Fidelity was not a party to the Contract, it was a signatory on the Buyer's Statement (the "Settlement Statement") (Doc. 77, Ex. A, Settlement Statement).  The Settlement Statement required Haines and his partner to sign and agree to the following statement:

> The undersigned hereby certify that they have carefully received the Closing Disclosure or other settlement statement form, and they approve and agree to the payment of all fees, costs, expenses and disbursement as reflected on the Closing Disclosure or other settlement statement form to be paid on their behalf.  We further certify that we have received a copy of the Closing Disclosure or other settlement statement.

(Doc. 77, Ex. A, Settlement Statement).  In turn, the Settlement Statement required a representative from Fidelity to attest to the following:

> I have reviewed the Closing Disclosure, the settlement statement, the lender's closing instructions and any and all other forms relative to the funds held in escrow, including any disclosure of the Florida title insurance premiums being paid, and I agree to disburse the escrow funds in accordance with the terms of this transaction and Florida law.

---

[2]  In Florida, "Closing Services" for purposes of title insurance contracts encompass "services performed by a licensed title insurer, title insurance agent or agency, or attorney agent in the agent's or agency's capacity as such, including, but not limited to, preparing documents necessary to close the transaction, conducting the closing, or handling the disbursing of funds related to the closing in a real estate closing transaction in which a title insurance commitment or policy is to be issued."  Fla. Stat. § 627.7711(1)(a).

(Doc. 77, Ex. A, Settlement Statement).  During the closing process in the Haines real estate transaction, Fidelity performed the Closing Services, as the Seller selected, and charged a Closing Services Fee ("CSF") in the amount of $350 to Haines, as detailed on the Settlement Statement (Doc. 77, Ex. A, Settlement Statement).  At the time of closing, Haines neither objected to the $350 fee nor discussed with Fidelity any dispute over whether the Settlement Statement was prepared in accordance with the Contract.  Admittedly, at that time, Haines believed that the Settlement Statement was prepared in accordance with his and the Seller's agreement reflected in the FARBAR, including all charges, receipts, and disbursements.  Notwithstanding, Haines asserts that nothing obligated he or other cash buyers to pay Fidelity a CSF in connection with their real estate transactions, and, by allocating and collecting a CSF from Haines and other cash buyers in Florida, Fidelity breached its fiduciary duty to him and other cash buyers, Fidelity was either grossly negligent or negligent in performing its duties in conjunction with its provision of Closing Services to cash buyers, and Fidelity was unjustly enriched as a result of its actions.

Given Fidelity's actions, Haines initiated litigation in state court, asserting claims on behalf of himself and a proposed class against Fidelity, which Fidelity subsequently removed to federal court (Doc. 1).  In support of its Notice of Removal, Fidelity submitted the Declaration of Barbara Mott Howe ("Howe"), the President of Fidelity, who indicated that Fidelity identified 25,187 closings that potentially met the parameters set out by Haines in the state-court class action

complaint (Doc. 1-2, Declaration of Barbara Mott Howe in Support of Defendant Fidelity National Title of Florida, Inc.'s Notice of Removal ("Howe Decl."), ¶7).[3] According to Howe, assuming Haines and the other similarly situated Florida home buyers (*i.e.*, proposed class members) were indeed wrongfully charged $350, the proposed class would recover $8,814,450 (Howe Decl., ¶10).

Following removal, Haines amended the complaint twice (Docs. 4 & 43). As noted, in the Second Amended Complaint, Haines sets forth claims on behalf of himself and all others similarly situated against Fidelity for gross negligence, negligence, breach of fiduciary duty, and unjust enrichment (Doc. 43). Mainly, Haines alleges that Fidelity owed a duty of care to Haines and class members to act competently and diligently with regards to closing the sale between buyers and sellers and, through either gross negligence or negligence, failed to review Paragraph 9(c) of the FARBAR when allocating and charging costs to the buyer and seller such that Haines and class members, as cash buyers, were charged a CSF despite the FARBAR stating that the CSF would be charged only to the seller (Doc. 43, ¶¶53-67). Beyond that, Haines alleges that, as the closing agent for the buyers and sellers, Fidelity owed a fiduciary duty to the buyer and seller to deal in the utmost good faith, to refrain from self-dealing, and to act in the best interest of the buyer and seller, but, by failing to comply with the terms of the FARBAR and thereby failing to conduct and supervise the closings in accordance with the terms

---

[3] Fidelity refers to the declaration as the "Mott Decl.," but the undersigned will refer to it as the "Howe Decl." and any other reference to her or her declarations or testimony as "Howe" given her last name.

of the FARBAR by improperly charging and collecting CSFs from Haines and class members, Fidelity breached that duty which directly and proximately caused harm to Haines and class members (Doc. 43, ¶¶68-80).  Alternatively, Haines alleges that Fidelity was unjustly enriched when it collected an unauthorized CSF because Haines and class members paid more than they bargained for and did not receive the benefits they anticipated while Fidelity received money for which no entitlement existed (Doc. 43, ¶¶81-90).  Haines seeks several forms of relief to redress the harm caused by Fidelity, including an order certifying that this action may be maintained as a class action, a declaration that Fidelity's practice of charging and collecting a CSF from buyers in cash transactions under FARBARs violates the rights of buyers, an injunction prohibiting Fidelity from collecting CSFs from buyers in cash transactions under FARBARs, and an award of actual damages, costs, and interest.

By the instant motion, Haines moves on behalf of himself, and all others similarly situated, for class certification on the claims for breach of fiduciary duty and unjust enrichment (Doc. 77).[4]  Specifically, Haines proposes the following class definition:

> All Buyers in all cash real estate transactions in Florida, that used an "As Is" Residential Contract for Sale and Purchase form approved by the Florida Association of Realtors and Florida Bar and, that selected sub-paragraph (i) of Section 9(c), but who were charged and paid a Closing Agent Closing Services Fee, during the four years precedent to the date of filing the Complaint, through and until the date Notice is provided to the Class.

---

[4]  During a hearing held on the instant motion, Haines's counsel indicated that he would not seek class certification on his claims for gross negligence and negligence.

(Doc. 77, at 8-9).  According to Haines, each class member used the same and materially indistinct FARBAR, paid cash for the purchase of real estate, selected Section 9(c)(i) on the FARBAR, was charged a CSF by Fidelity despite selecting Section 9(c)(i), and paid a CSF to Fidelity even though Section 9(c)(i) required Fidelity to only allocate a CSF to sellers, not cash buyers.  Based on Fidelity's common course of conduct utilizing a form contract, Haines believes the claims in this matter warrant class-wide treatment.

To that end, Haines contends that the class meets the requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and Rule 23(b)(3) (predominance and superiority), thus warranting certification of the class.  As to the Rule 23(a) requirements, Haines argues that he established numerosity, as potentially thousands of class members fit the class definition; commonality, as common questions of law pertaining to both the claims and defenses in this action are subject to class-wide proof; typicality, as his claims are typical of and nearly identical, if not identical, to the claims of members of the class; and adequacy of representation, as he and his counsel have thus far pursued and will continue to pursue the claims on behalf of and in the interests of the class.  Regarding the Rule 23(b) requirements, Haines asserts that the predominance and superiority requirements are met because common issues of law predominate over any individualized issues belonging to class members and a class action represents a more efficient and superior means for adjudicating the claims compared to thousands of individual lawsuits.

Fidelity opposes Haines's Motion for Class Certification, arguing that Haines failed to establish the requirements necessary under Rule 23 to proceed as a class action (Doc. 81).   Fidelity suggests that the proposed class is inadequately defined, not clearly ascertainable, and of an unknown size.  Going further, Fidelity contends that individualized issues predominate over any common issues regarding Haines's claims and Fidelity's defenses, including the need for individualized factfinding to cull the universe of buyers down to potential class members; individualized proof required for establishing elements of Haines's claims, such as duty, breach, causation, and unjust enrichment; and individualized evidence to overcome the FARBAR's limitation of liability clause and issues of voluntary payment, comparative fault, and knowledge.  Rounding out the Rule 23(a) factors, Fidelity argues that Haines cannot establish typicality or adequacy of representation. Finally, Fidelity asserts that Haines failed to show that a class action provides the superior mechanism for resolution of the claims in this action.  Given the failure to satisfy the Rule 23 requirements, Fidelity contends that class certification is unwarranted.[5]

---

[5]  The parties subsequently submitted cross-motions for summary judgment (Doc. 98-102), which have not been referred to the undersigned for consideration.  Fidelity explicitly requested that the Motion for Class Certification be addressed prior to a ruling on the merits on the cross-motions for summary judgment (Doc. 98, at 29-30).  The parties also submitted cross-motions to strike expert witnesses or reports (Doc. 95 & 104), which will be addressed by separate order, as the issues contained therein do not affect the resolution of the instant motion.  After the filing of those motions, and per the request of the parties, the District Judge stayed the remaining deadlines until issuance of a final ruling on the motions seeking class certification and summary judgment (Doc. 114).

## II.   Legal Standard

District courts maintain broad discretion in determining whether to certify a class. *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1364 (11th Cir. 2021); *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992) (citation omitted).   Since the class action provides an exception to the general rule that litigation be conducted by and on behalf of the individual named parties only, to justify certification of a class, a class representative must be a member of the class and possess the same interest and suffer the same harm as the class members. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (citations omitted).   The advocate of the class thus carries the burden of proof to establish the propriety of class certification.  *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016).   If the court harbors doubt about whether the party seeking class certification carries that burden, the party loses.  *Id.*

In determining whether class certification is appropriate, "Rule 23 establishes the legal roadmap courts must follow." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003).  Namely, Rule 23(a) requires the moving party to demonstrate that:

(1)   the class is so numerous that joinder of all members is impracticable;

(2)   there are questions of law or fact common to the class;

(3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)   the representative parties will fairly and adequately protect the

interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4).  "Failure to establish any one of these four factors and at least one of the alternative requirements of Rule 23(b) precludes class certification."  *Valley Drug*, 350 F.3d at 1188 (citation omitted); *see Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279, 1282 (11th Cir. 2011) ("To satisfy Rule 23, the putative class must meet each of the four requirements specified in 23(a), as well as at least one of the three requirements set forth in 23(b).") (citation omitted).

Accordingly, if a district court determines that the moving party established the numerosity, commonality, typicality, and adequacy-of-representation requirements of Rule 23(a), the court then determines whether the moving party established the requirements of one of three possible categories under Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997); *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (citations omitted).  In this instance, Haines seeks certification of the class pursuant to Rule 23(b)(3).  Under Rule 23(b)(3), a class action may be maintained if Rule 23(a) is satisfied and if:

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

In determining the propriety of a class action, the question is whether the moving party meets the requirements of Rule 23, not whether the moving party states a cause of action or will prevail on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (citation omitted). Though a district court should not reach the merits of a claim when considering the propriety of class certification, "this principle should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984). Instead, the district court can consider the merits of the moving party's claim at the class certification stage to the degree necessary to determine whether the moving party satisfied the requirements of Rule 23. *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1337 (11th Cir. 2006) (citations omitted); *see Dukes*, 564 U.S. at 350-51 (stating that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, ... and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied ... Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of

12

action.") (internal citations, internal alterations, internal quotations, and citations omitted). In doing so, the district court does not determine whether the plaintiff will ultimately prevail on the merits; instead, the district court considers the factual record in determining whether the plaintiff satisfied the requirements of Rule 23. *Valley Drug*, 350 F.3d at 1188 n.15. A class certification ruling therefore does not adjudicate the case but rather selects the method best suited to fairly and efficiently adjudicate the controversy. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013).

### III. Discussion

#### A. Standing

Prior to the certification of a class, and before undertaking any formal typicality or commonality review, "the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000); *see Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009) (noting that, to certify a class action, the named plaintiffs must have standing, and the putative class must meet all of the requirements of Rule 23(a) in addition to at least one of the requirements in Rule 23(b)). Standing consists of the following three elements: (1) the plaintiff must have suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted); *see also TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021) ("To

answer that question in a way sufficient to establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.") (citation omitted).    More simply, the plaintiff must show that the defendant harmed him, and that a court decision can either eliminate the harm or compensate him for it.  *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020).  The standard does not change in suits involving class-action allegations because even named plaintiffs who represent a potential class must allege and demonstrate that they personally have suffered injury, not that injury has been suffered by other, unidentified members of the class to which they belong.  *Spokeo*, 578 U.S. at 338 n.6.  If the named plaintiff does not claim to have suffered an injury caused by the defendant and for which the court can fashion a remedy, no case or controversy exists for a federal court to resolve.  *TransUnion*, 141 S.Ct. at 2203.

Here, Haines alleges that he suffered a particularized injury traceable to and arising from Fidelity's course of conduct in preparing his Settlement Statement allocating a CSF to Haines, as a cash buyer, which conflicted with the express terms set forth in the FARBAR under Section 9(c)(i) directing that a CSF would be charged to buyers for closing services related to lender services, and then collecting such CSF from Haines.  As noted, Haines alleges that Fidelity's conduct resulted in an improper allocation to Haines and subsequent payment by Haines of the $350 CSF to Fidelity even though Haines purchased the real estate property in an all-cash

transaction with no lender involvement.[6]   To redress this harm, Haines seeks, among other things, damages in the amount of the total CSF paid by and charged to him.  For purposes of Article III standing, such allegations establish a cognizable, particularized, and personal injury fairly traceable to Fidelity's actions and likely to be redressed by a favorable judicial decision.  Indeed, Fidelity does not dispute that Haines maintains standing to bring his claims in this action.  Haines thus established Article III standing.

### B.   Adequately Defined and Clearly Ascertainable

Haines next asserts that the class is both adequately defined and clearly ascertainable.   In arguing the impropriety of class certification, Fidelity first contends that Haines failed to adequately define the proposed class and that the proposed class is not clearly ascertainable.  Mainly, Fidelity argues that the need for individualized factfinding confirms that the class is neither adequately defined nor clearly ascertainable.  Ascertainability serves as an implied prerequisite of Rule 23. *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021).  Before a district court can consider whether a potential class satisfies the prerequisites of Rule 23(a), a class representative must demonstrate that the proposed class is "adequately defined and clearly ascertainable."  *Id.* (citation omitted).  Class definition and ascertainability typically involve one inquiry because, without an adequate definition for a proposed class, a district court cannot ascertain who belongs in the class.  *Id.*  For purposes of

---

[6]  In support, Haines provides the Contract and Settlement Statement used in his real estate transaction, which outline the terms of the real estate transaction and show the Closing Fees charged by Fidelity and paid by Haines (Doc. 77, Ex. A).

class certification, "a proposed class is ascertainable if it is adequately defined such that its membership is capable of determination." *Id.* at 1304.  Stated differently, a class can be deemed "clearly ascertainable" when a court is certain that its membership is capable of being determined.  *Id.* at 1303.  Conversely, "[a] class is inadequately defined if it is defined through vague or subjective criteria."  *Id.* at 1302.  An adequately defined class thus should be defined by objective criteria with its members identifiable.  *Scoma Chiropractic, P.A. v. Dental Equities, LLC*, Case No: 2:16-cv-41-JLB-MRM, 2021 WL 6105590, at *10-11 (M.D. Fla. Dec. 23, 2021).

Membership in a proposed class "can be capable of determination without being capable of *convenient* determination."  *Cherry*, 986 F.3d at 1303 (emphasis in original).  While recognizing a split among the circuit courts regarding the proper role of administrative feasibility, the Eleventh Circuit explicitly concluded that "[p]roof of administrative feasibility cannot be a precondition for certification" nor is it an inherent aspect of ascertainability.  *Id.* at 1302 & 1303.  Going further, the Eleventh Circuit stated that "[b]ecause administrative feasibility has no connection to Rule 23(a), it is not part of the ascertainability inquiry."  *Id.* at 1303.  Though not a precondition for certification, considerations of administrative feasibility may still be relevant for the Rule 23(b)(3)(D) manageability analysis, but the propriety of a class action should not hinge upon whether the class is ascertainable.  *See Rensel*, 2 F.4th at 1361; *see Cherry*, 986 F.3d at 1303-04.  A plaintiff can demonstrate administrative feasibility by explaining to the court how the remainder of the class may be located after certification by showing that the proposed process will be

manageable and successful. *Cherry*, 986 F.3d at 1303. "But neither foreknowledge of a method of identification nor confirmation of its manageability says anything about the qualifications of the putative class representatives, the practicability of joinder of all members, or the existence of common questions of law or fact. … Because administrative feasibility has no connection to Rule 23(a), it is not part of the ascertainability inquiry." *Id.* Stated plainly, "administrative feasibility is not a requirement for certification under Rule 23." *Id.* at 1304.

Fidelity acknowledges that *Cherry* controls, meaning that Haines does not need to demonstrate an ability to identify class members in a convenient or administratively feasible manner. *See Cherry*, 986 F.3d at 1304; *see also Rensel*, 2 F.4th at 1361. Notwithstanding, Fidelity argues that the class is inadequately defined and not clearly ascertainable because Haines does not challenge any uniform conduct Fidelity applied to all buyers but instead proposes certification of a subset of individuals who must meet eight distinct criteria along with an additional criterion not set forth in the class definition. Per Fidelity, the class definition requires the following individualized merits inquiries that cannot be achieved on a class-wide basis: all (1) buyers in (2) all-cash real estate sale transactions (3) in Florida, (4) who used a FARBAR and (5) who selected sub-paragraph (i) of Section 9(c), but (6) who were charged and (7) paid a CSF, (8) during the four years precedent to the date of filing the Complaint, through and until the date Notice is provided to the class. Additionally, Fidelity points to language in Haines's motion setting forth a ninth criterion, which requires that no signed modifications,

amendments, or relevant addendums altering the FARBAR's terms exist (*see* Doc. 77, at 2). Given these nine criteria, Fidelity argues that certification of a class would require time-consuming, expensive, and individualized factfinding for more than 25,000 transactions, which leads to the conclusion that no administratively feasible means exists for ascertaining who qualifies as a class member without individualized factual inquiries.

Even without regard to administrative feasibility, Fidelity argues that the need for such individualized factfinding confirms that the proposed class is not adequately defined or clearly ascertainable. Fidelity contends that individually determining the facts and only keeping claims where the facts are determined favorably to Haines and the class members would create a fail-safe class, wherein the class is defined such that whether an individual qualifies as a class member depends on whether the individual possesses a valid claim. Moreover, Fidelity assesses Haines's statements regarding the process and effort required to locate the pertinent documents to each claim as an oversimplification of what would be required going forward, including as to the nature of the documents, as the ninth criterion would require a file-by-file and document-by-document review to identify the purchase contract and final settlement statement as well as any modifications or amendments.

At least one court considering issues relating to adequate definition of a class and administrative feasibility post-*Cherry* rejected these same arguments. *See, e.g., McCullough v. City of Montgomery*, Case No. 2:15-cv-463-RCL, 2021 WL 2044900, at

*11-12 (M.D. Ala. May 21, 2021).  For instance, in *McCullough*, the court rejected the defendants' arguments that the class was not ascertainable if individual inquiries were necessary to determine class membership and if the proposed class criteria were subjective as applied, as the former argument simply repackaged the administrative feasibility test that *Cherry* rejected, and *Cherry* precluded the latter since the court could not look to how the plaintiffs proposed to apply the class criteria but could only look to whether a class could be ascertained *Id.* at *11. Continuing in the analysis, the *McCullough* court rejected the defendants' argument that the class was overinclusive because it included individuals who did not suffer an injury from the defendants' conduct, stating that the proper place for such analysis belonged in the analysis of the Rule 23 factors, not in establishing the ascertainability of the class.  *Id.* at *12.  Finally, the *McCullough* court concluded that, despite defendants' argument that the class criteria assumed essential elements of the cause of action, thus creating a fail-safe class, the class definition in that action did not turn on the merits because a class member would be bound by the judgment even if he or she could not prove the elements of that violation.  *Id.*

Likewise, Fidelity's arguments that the proposed class is neither adequately defined nor administratively feasible fail for the same reasons.  Most importantly, Haines adduced sufficient evidence demonstrating that identification of class members turns on objective, verifiable criteria – whether the buyer engaged in an all-cash real estate sale transaction in Florida, whether the buyer and seller used a FARBAR, whether the buyer selected sub-paragraph (i) of Section 9(c), and

whether the buyer was charged and paid a CSF during the applicable period. Notwithstanding Fidelity's argument to the contrary, the evaluation of the class criteria does not involve subjective analysis. Rather, whether a potential class member meets such criteria can be determined from the face of documents contained in the transaction files as well as other evidence. Accordingly, the proposed class is defined by objective criteria and capable of determination. *See Cherry*, 986 F.3d at 1303-04; *Scoma Chiropractic*, 2021 WL 6105590, at *10-11. Fidelity's arguments regarding any administrative burden or individualized inquiries related to going through the pertinent transaction files and arguments regarding the merits of the claims or defenses do not bear upon the issue of whether Haines adequately defined the class but instead pertain to whether Haines can establish the requirements of Rule 23(a) and (b), each of which will be discussed in greater detail below. As the foregoing illustrates, Haines demonstrated an adequately defined, ascertainable class for purposes of class certification.

### C.    Rule 23(a)

The question now turns to whether Haines can establish the Rule 23 requirements for class certification. As noted, under Rule 23(a), one or more members of a class may sue as representative parties on behalf of all members only if the movant establishes the numerosity, commonality, typicality, and adequacy-of-representation requirements. Fed. R. Civ. P. 23(a)(1)-(4).

#### i.    Numerosity

Initially, Haines must demonstrate that the class is so numerous that joinder

of all members would be impracticable.  Fed. R. Civ. P. 23(a)(1).  To establish numerosity, the moving party typically must demonstrate either some evidence or a reasonable estimate of the number of purported class members.  *Kuehn v. Cadle Co., Inc.*, 245 F.R.D. 545, 548 (M.D. Fla. 2007) (citation omitted); *cf. Vega*, 564 F.3d at 1267 (noting that, while mere allegations of numerosity are insufficient, a plaintiff need not show the precise number of members in the class).  Though no fixed numerosity rule exists, courts generally determine less than twenty-one members of a proposed class is inadequate to establish numerosity and more than forty members of a proposed class is adequate to establish numerosity, with numbers between varying based upon other factors.  *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); *see Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (concluding that a district court did not abuse its discretion in finding that the numerosity requirement had been met where a plaintiff identified at least 31 individual class members).  While the moving party bears a minimal burden to make *some* showing of numerosity, the party need not show the precise number of members in the class.  *Vega*, 564 F.3d at 1267.  Indeed, the numerosity requirement presents a "generally low hurdle."  *Id.*

During discovery, the undersigned permitted Haines to test a sample of the 25,187 transaction files initially identified by Fidelity.  Haines employed third-party vender, Meta-e Discovery LLC ("Meta-e") to conduct a random sampling of the

transaction files (Doc. 77, Ex. B, Report of Paul McVoy ("McVoy Report"), at 2).[7] In generating a random sample list of 379 transaction files, Meta-e used the Relativity software's sampling function, which boasts a 95% confidence level and a margin error of 5% (McVoy Report, at 2).[8]  Of the 377 transaction files produced and sampled, Meta-E and Haines identified 127 unique transactions that purportedly fit within the class definition (McVoy Report, at 3-4, 6-10 & Ex. 8; Doc. 77, Ex. D, Joint Declaration of Proposed Class Counsel in Support of Motion for Class Certification ("Class Counsel Decl."), ¶29).  Based on the sample size and applying the same percentages to the total unique transactions identified, Haines estimated a potential class size of 8,437 class members, with an aggregate amount of damages for the transactions meeting the class definition totaling $2,176,745 (Counsel Decl., ¶¶30-33; McVoy Report, Ex. 8).

Haines contends that the foregoing demonstrates that the numerosity requirement is satisfied, as the case involves thousands of potential class members. Fidelity does not dispute Haines's contention, nor could it.  By Fidelity's own initial estimate, approximately 25,187 cash transactions might be implicated (Howe Decl.,

---

[7]  According to Paul McVoy, Chief Executive Officer of Meta-e, Fidelity identified 25,187 unique transactions but included a duplicate transaction, so the universe of potential unique transactions provided to Meta-e included only 25,186 unique transactions (although a scrivener's error in the footnote indicates 26,186 unique transactions) (McVoy Report, at 1 & 3 n.1).  Meta-e therefore conducted the random sampling on only the 25,186 non-duplicative unique transactions.  When referencing the total number of transaction files, the undersigned will refer to the 25,187 originally identified by Fidelity, however.

[8]  McVoy indicates that, though the random sampling produced 379 unique transaction files, Fidelity produced information for only 377 transactions, which Meta-e and Haines used to distill the transactions down to a list of those transactions that purportedly met the class definition (McVoy Report, at 3 n.2).

¶¶6-7, 9).  In its response, Fidelity reiterates that more than 25,000 transactions may be involved and omits any argument regarding Haines's inability to meet the standard for establishing numerosity (*see* Doc. 81, at 8-11).  Given the thousands of potential class members, whether it be closer to the approximately 25,000 initially identified by Fidelity or the approximately 8,000 estimated by the random sampling, Haines easily established numerosity.

ii.   **Commonality**

Haines must next establish commonality, or that there exists questions of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2).  While both the commonality and typicality requirements focus on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members, commonality pertains to the group characteristics of the class as a whole, whereas typicality pertains to the individual characteristics of the named plaintiff in relation to the class.  *Piazza v. Ebsco Indust., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (citations omitted); *Prado*, 221 F.3d at 1278.  To meet the commonality requirement, the moving party must demonstrate that the class action involves issues susceptible to class-wide proof.  *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (citation omitted).  The burden of establishing commonality is "relatively light."  *Vega*, 564 F.3d at 1268.  Essentially, the moving party must show that the determination of the truth or falsity of a common contention will resolve an issue that is central to the validity of each of the claims in one stroke.  *Dukes*, 564 U.S. at 350.  Commonality therefore requires "at least

one issue whose resolution will affect all or a significant number of the putative class members."  *Williams*, 568 F.3d at 1355 (citation and internal quotation marks omitted).  Notably, "Rule 23 does not require that all the questions of law and fact raised by the dispute be common."  *Cox*, 784 F.2d at 1557 (citations omitted).

In this instance, Haines contends that the class meets the commonality requirement because the claims concern a policy implemented by Fidelity involving use of a form contract executed under substantially similar circumstances for each potential class member.  *See Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010) ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment."); *see Herman v. Seaworld Parks & Ent., Inc.*, 320 F.R.D. 271, 290 (M.D. Fla. 2017) ("An alleged policy or practice of treating an entire class unlawfully satisfies the commonality requirement of Rule 23(a)(2)."); *Kleiner v. First Nat. Bank of Atlanta*, 97 F.R.D. 683, 692 (N.D. Ga. 1983) ("When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such.").  Haines argues that the claims turn primarily upon whether Fidelity failed to prepare settlement statements in accordance with Section 9(c)(i) of the FARBAR and whether such failure constituted a breach of fiduciary duty or unjustly enriched Fidelity.  In making that determination, Haines contends that the Court will need to consider the following common questions applicable to all class members:

    1.    Whether class members used a FARBAR and selected Section 9(c)(i);

2.      Whether Fidelity maintained a duty to prepare settlement statements in accordance with the FARBAR;

3.      Whether Section 9(c)(i) of the FARBAR dictates that Fidelity was supposed to charge its CSF only to sellers;

4.      Whether cash buyers were obligated under the FARBAR, when selecting Section 9(c)(i), to pay a CSF to Fidelity;

5.      Whether Fidelity breached a duty owed to class members when it prepared settlement statements allocating a CSF to them; and

6.      Whether Fidelity was unjustly enriched by allocating a CSF to class members.

Moreover, Haines asserts that Fidelity's defenses raise common questions, including whether the terms of the FARBAR are imputed upon Fidelity, whether the scope of Closing Services Fidelity performs and the fees it charges are addressed by the FARBAR, whether the written contract entered into between the buyer and seller controls who should be charged a CSF, and whether a signed settlement statement insulates Fidelity from liability under the voluntary payment doctrine or another waiver, estoppel, or knowledge-based defense.  In sum, Haines contends that Fidelity engaged in a common course of conduct using a standardized form such that the application of the same common defenses due to class members signing a settlement statement or their alleged knowledge of the fee provides an additional link of commonality between class members.

Fidelity contests this point, combining its arguments regarding the commonality requirement under Rule 23(a)(2) and the predominance requirement under 23(b)(3) in stating that several individualized issues predominate over any

allegedly common issues.  Specifically, Fidelity argues that individualized issues predominate, including the need for individualized factfinding to cull a universe of buyers down to potential claimants; for proving Haines's claim elements, especially as to causation and as to the unjust enrichment claim; and for Fidelity's defenses, including the need for individual evidence to overcome the FARBAR's limitation of liability clause, voluntary payment issues, comparative fault issues, and knowledge-based defense issues.  Given such issues, Fidelity asserts that Haines cannot establish commonality.

The predominance inquiry under Rule 23(b)(3) is far more demanding than the commonality requirement under Rule 23(a), however.  *Vega*, 564 F.3d at 1270. As noted above, the burden of establishing commonality is "relatively light," and, despite Fidelity's attempts to do so, the commonality inquiry should not be merged with the Rule 23(b) predominance inquiry.  *Id.* at 1268-70.  Considering the minimal burden required, therefore, Haines established commonality.  As discussed below, though the common issues do not predominate, there are some overarching issues common to all claims involving whether Fidelity owed a duty and breached such duty to Haines and the putative class members or, alternatively, whether Fidelity was unjustly enriched by collecting a CSF from Haines and other cash buyers who selected Section 9(c)(i) on the FARBAR.  Put plainly, common issues regarding the interpretation of the FARBAR and the settlement statements and its effect on Fidelity's rights and duties to cash buyers in real estate transactions in Florida during the applicable period will affect all or a significant number of the putative

class members. *Williams*, 568 F.3d at 1355 (citation and quotation omitted). Although issues of fact exist, some common legal issues remain central to the validity of each of the claims. *Dukes*, 564 U.S. at 350. Accordingly, Haines met the "relatively light" burden for establishing commonality.

### iii.   Typicality

The next requirement Haines must demonstrate is that of typicality. As indicated above, commonality traditionally refers to the group characteristics of the class as a whole, and typicality refers to the individual characteristics of the named plaintiff in relation to the class. *Prado*, 221 F.3d at 1279. Though the issues of commonality and typicality require separate inquiries, the proof required for each tends to merge. *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 456 (11th Cir. 1996). Typicality involves the following:

> A class may be certified only if the claims or defenses of the representative parties are typical of the claims or defenses of the class. The claim of a class representative is typical if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3). The typicality requirement may be satisfied despite substantial factual differences when there is a strong similarity of legal theories.

*Williams*, 568 F.3d at 1356-57 (internal citations, internal quotations, and internal alterations omitted). To satisfy the typicality requirement, the class representative need not demonstrate that all putative class members share identical claims. *Piazza*, 273 F.3d at 1351 (citation and quotation marks omitted); *see Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) ("A sufficient nexus is

established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. Typicality, however, does not require identical claims or defenses.  A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class").  Typicality thus may be satisfied even if some factual differences exist between the claims of the class representative and the claims of the class at large. *Piazza*, 273 F.3d at 1351.  For example, "[d]ifferences in the amount of damages between the class representative and other class members does not affect typicality." *Kornberg*, 741 F.2d at 1337 (citation omitted).  Even where substantial factual differences exist, a strong similarity of legal theories will satisfy the typicality requirement. *Piazza*, 273 F.3d at 1351.

Haines contends that typicality is satisfied because Haines possesses the same interests and suffered the same injury as class members.  Haines argues that his claims, like the claims of each proposed class member, arise out of the same course of conduct and each class member's claims are based upon the same legal theory as Haines's claims during the applicable period.  For example, Haines believes that if he establishes that Fidelity committed a breach of fiduciary duty, the breach will be established on behalf of all class members; conversely, if Haines cannot establish a breach of fiduciary duty, such finding will apply to all class members.

Fidelity counters, asserting that Haines failed to establish typicality for four reasons.  First, Haines failed to join his partner, with whom he purchased the

property and paid the fees, as a necessary party in this action.  Given such failure, Fidelity argues that Haines's claims are subject to dismissal, making him an atypical, inadequate representative for the class.  Second, Fidelity argues that no buyer could be considered "typical" based on the uniqueness of each real estate transaction and each closing.  Third, according to Fidelity, Haines's admissions relating to fact-specific defenses, including waiver, estoppel, and voluntary payment, bar his claims and thereby render him atypical.  Lastly, Fidelity contends that Haines cannot establish that his claims are typical because he never possessed and still does not possess any independent belief that Fidelity erred, as Haines derived all his knowledge from his counsel, only determining that the fee may have been improper after speaking to counsel.

On this record, Haines established typicality.  Most importantly, Haines's claims are premised on the same legal theory and share the same essential characteristics as the claims of class members.  Haines and each proposed class member used a FARBAR in an all-cash real estate transaction in Florida during the applicable period, selected Section 9(c)(i) on the FARBAR, were charged a CSF by Fidelity, and paid Fidelity the CSF.  Whether under a theory of breach of fiduciary duty or unjust enrichment, Haines and each of the proposed class members premise their claims on the same legal theory and seek to redress the same or similar harm. A sufficient nexus between the claims of the class and Haines thus exists.

While some factual differences exist among class members, including the amount of damages and questions regarding causation and defenses, given that

every real estate transaction at issue is not identical, Haines's claims and the claims of the class members are premised upon the same legal theories. Further, and as discussed in more detail below, the fact that Haines derived knowledge regarding his claims from his counsel does not affect the analysis or render him atypical because the way in which Haines became aware of his claims does not affect the substance of his claims, which comport with the substance of the claims of class members. Lastly, Fidelity's argument relating to the failure of Haines to join his partner in this action also falls flat.[9] As Haines indicated during the hearing, a strong likelihood exists that many of the transactions will involve spouses who jointly purchased the property. In those transactions, if Haines or the class members prevail, only one award will issue for the improperly charged CSF in the single closing transaction such that no double-dipping or multiple awards will occur. Effectively, the outcome will be the same regardless of whether a spouse or other partner was involved in the real estate transaction. The fact that Haines failed to join his partner therefore does not defeat typicality. Rather, given that Haines's claims and the claims of the class are based on the same legal theories, Haines established typicality.

### iv.    Adequacy of Representation

Finally, Haines must satisfy the adequacy-of-representation requirement,

---

[9] As Haines correctly noted during the hearing, Fidelity never moved to dismiss on the basis that Haines failed to properly join his partner in this action. *See* Fed. R. Civ. P. 12(b)(7) & 19. Asserting the argument for the first time in response to the class certification motion therefore does not bode well for Fidelity.

which requires the representative party in a class action to fairly and adequately protect the interests of those he purports to represent. Fed. R. Civ. P. 23(a)(4); *Valley Drug*, 350 F.3d at 1189. One of the principal factors for determining the adequacy of a class representative is whether the class representative can be expected to assert and defend the interests of the members of the class with "forthrightness and vigor." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987) (citations omitted). In considering whether a named plaintiff will represent the potential class with sufficient vigor to satisfy the adequacy requirement, the named plaintiff must demonstrate both (1) that the named plaintiff's interests and that of his or her counsel are not antagonistic to or in substantial conflict with those of the rest of the class and (2) that the named plaintiff and his or her counsel are generally able to adequately prosecute the action and conduct the proposed litigation. *See Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008); *see Kirkpatrick*, 827 F.2d at 726. Furthermore, in appointing class counsel, a district court must consider (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Haines contends that he will adequately represent the interests of the class. According to Haines, he and each class member share a common interest in establishing the wrongfulness of Fidelity's common practice taken against them,

and, as he proves his individual claims, he proves the claims of the thousands of class members. Haines declares that he understands the duties of a class representative and will continue to advance the case on behalf of and in the interests of the class, including providing testimony and responses to discovery (Doc. 77, Ex. G, Declaration of John P. Haines ("Haines Decl."), ¶¶10-15). As the record demonstrates, Haines initiated the instant action on behalf of himself and the putative class, submitted to interviews with counsel, provided documents and information to counsel, participated in conferences with counsel, responded to formal discovery, submitted to a deposition conducted by Fidelity's counsel, and attended mediation (Haines Decl., ¶¶10-15; Class Counsel Decl., ¶12). From this record, it does not appear that Haines maintains any interests that are antagonistic to or in substantial conflict with those of the rest of the class.

Fidelity attacks Haines's claims of adequacy solely as to the appointment of Haines as class representative and does not raise any arguments regarding the adequacy of potential class counsel. To that end, Fidelity contends that Haines cannot adequately represent the class because he impermissibly abdicated his role to his counsel and admittedly lacks knowledge of and involvement in this action so basically functions as a straw man in bringing his claims.[10] Fidelity points to Haines's September 25, 2020 deposition testimony, wherein Haines indicated that he was unaware of the difference between his role and the role of the other unnamed

---

[10] Fidelity also contends that Haines cannot serve as class representative for the same reasons that he is atypical. As discussed above, Haines meets the requirements for typicality, so Fidelity's argument fails.

plaintiffs he sought to represent, he lacked knowledge or understanding as to whether he needed to participate in settlement discussions and mediation,[11] he lacked knowledge about the alleged overcharge until he spoke with his attorneys, and that he would defer to his attorneys about whether any potential settlement was fair, adequate, or reasonable (Doc. 85-2, Deposition of John P. Haines ("Haines Dep."), at 69-71, 74-78, 113-15). Considering such testimony, Fidelity argues that any contrary statements by Haines in his subsequent declaration, attested to on May 19, 2021, regarding his readiness, willingness, and ability to perform the role of class representative constitute a sham (*see* Haines Decl., ¶¶1-15).

Fidelity's argument is unpersuasive. "It is well-settled that it is not necessary for named class representatives to be knowledgeable, intelligent or have a firm understanding of the legal or factual basis on which the case rests in order to maintain a class action." *Powers v. Gov't Emps. Ins. Co.*, 192 F.R.D. 313, 317 (S.D. Fla. 1998). Although some courts have found that a potential for abuse exists where a class representative maintained so little knowledge of and involvement in the class action that the class representative would be unable or unwilling to protect the interests of the class against the potentially competing interests of the attorneys, a

---

[11] The Mediation Order, entered in this action after Haines's deposition, indicated that each attorney acting as lead trial counsel and each party with full authority to settle must attend and participate in the mediation conference (Doc. 67, ¶4(b)). Per the Mediator's Report, the parties conducted a mediation conference on April 19, 2021 (Doc. 68). Given the directives in the Mediation Order and representations made by Haines's counsel during the hearing on the instant motion and in their declaration (Class Counsel Decl., ¶12), Haines attended the mediation conference, further supporting his argument that he has and continues to adequately represent the interests of the class.

lack of specific knowledge about the claims will generally not warrant the denial of class certification where the representative's counsel can capably handle the litigation. *Vision Constr. Ent. Inc v. Argos Ready Mix LLC*, Case No. 3:15cv534-MCR-HTC, 2019 WL 11075886, at *13 (N.D. Fla. Nov. 7, 2019); *cf. McCullough*, 2021 WL 2044900, at *10 (N.D. Ala. May 21, 2021) ("And a representative is qualified if he has at least a little knowledge about the case.") (*citing Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366 (1966)).   In fact, the Eleventh Circuit recognized that "adequate class representation generally does not require that the named plaintiffs demonstrate to any particular degree that individually they will pursue with vigor the legal claims of the class" because "the subjective desire to vigorously prosecute a class action … quite often is supplied more by counsel than by the class members themselves." *Kirkpatrick*, 827 F.2d at 727.   Although Haines relied upon his attorneys in initially fashioning his claims and did not fully understand the legal proceedings at the time of his deposition, the record belies Fidelity's assertion that Haines has abdicated his role to counsel or that he maintains so little knowledge of and involvement in this action that he would be unable or unwilling to protect the interests of the class. *See Lyttle v. Trulieve, Inc.*, Case No. 8:19-cv-2313-CEH-TGW, 2021 WL 3602996, at *7 (M.D. Fla. Aug. 13, 2021) ("Merely relying on counsel to prosecute an action does not render a plaintiff inadequate.") (citation omitted).   So far, Haines has demonstrated an ability and willingness to effectively represent the interests of the class and to move this action toward resolution, including sitting for a deposition, participating in discovery, and attending mediation.   Further, nothing

requires Haines to transform into an expert or an attorney to adequately serve as class representative.  *Id.* ("Although Trulieve focuses on Lyttle's unfamiliarity with certain aspects of litigation, such as his request for damages and whether a duty exists to absent class members in negotiating a resolution, the law does not require Lyttle to transform into an FCRA expert or an attorney in order for him to serve as class representative.").  Despite Fidelity's protestations, Haines demonstrated that he would be adequate to perform the duties of the class representative.

Likewise, Haines demonstrated that proposed class counsel would adequately represent the interests of the class.[12]  Namely, with respect to class counsel, Haines seeks to appoint Attorney Seth M. Lehrman ("Lehrman") of Edwards Pottinger, PLLC; Attorneys Joshua H. Eggnatz ("Eggnatz") and Michael J. Pascucci ("Pascucci") of Eggnatz Pascucci, P.A.; and Attorney Richard Feinberg ("Feinberg") of Florida Legacy Law, LLC (collectively, "Class Counsel").  As indicated above, in appointing class counsel, courts must consider (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; (4) the resources that counsel will commit to representing the class; and (5) any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class.   Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv) & (g)(1)(B).   Haines established that Class Counsel can adequately represent and protect the interests of

---

[12]  As noted above, Fidelity does not argue to the contrary.

the class and conduct the proposed litigation given that Class Counsel has already expended great time, effort, and resources on this matter, including engaging in discovery and motion practice, and demonstrated that their combined extensive experience, including handling the litigation, certification, and settlement of class action cases and real estate matters, will serve the interests of the class in pursuing the claims in this matter (Class Counsel Decl., Ex. 1-3).  Class Counsel assert that they will actively participate in litigation through trial, the processing of the class claims post-verdict, and any appeals necessary to protect the interests of the class (Class Counsel Decl., ¶11).  As such, Haines demonstrated that, considering all the factors, Class Counsel meets the adequacy-of-representation requirement.  In sum, therefore, Haines demonstrated that he and Class Counsel would adequately represent the interests of the class.  Accordingly, Haines established each of the Rule 23(a) factors.

### D.    Rule 23(b)

Having established the requirements under Rule 23(a), Haines asserts that the putative class also meets the requirements under Rule 23(b)(3).[13]  Specifically, Haines contends that the putative class satisfies the requirements regarding predominance of common issues and superiority of the class action to other means

---

[13]  Throughout the motion, Haines indicates that he seeks class certification pursuant to Rule 23(b)(3).  In a brief parenthetical in the conclusion section of the motion, however, Haines first references Rule 23(b)(1) and indicates that the proposed class alternatively meets the requirements contained therein (Doc. 77, at 30).  Since Haines presented no legal support or argument as to the viability of the class action under Rule 23(b)(1), this Report and Recommendation omits any analysis regarding whether a class should be certified pursuant to Rule 23(b)(1).

of litigation.  Fed. R. Civ. P. 23(b)(3).

### i.      Predominance

"[P]redominance … is perhaps the central and overriding prerequisite for a Rule 23(b)(3) class."  *Vega*, 564 F.3d at 1278 (citation omitted).  To satisfy the predominance requirement, the moving party must demonstrate that the issues in the class action subject to generalized proof, and therefore applicable to the class, predominate over the issues subject only to individualized proof.  *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (citations omitted).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods.*, 521 U.S. at 623.  The predominance inquiry thus focuses upon the legal or factual questions that qualify each class member's case as a genuine controversy and, therefore, is a far more demanding requirement than the commonality requirement under Rule 23(a).  *Jackson*, 130 F.3d at 1005; *see Vega*, 564 F.3d at 1270.  Predominance requires more than just the presence of common issues.  The common issues must outweigh and predominate over any individualized issues involved in the litigation.  *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 518 (S.D. Fla. 2013).  Common issues of fact and law will predominate where they directly impact every class member's effort to establish liability and every class member's entitlement to monetary relief.  *Babineau*, 576 F.3d at 1191.  If, practically speaking, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and

factual issues, common issues will not predominate.  *Id.*

To determine whether a party satisfies the requirement of predominance, a court must first identify the parties' claims and defenses and their elements and then classify the issues as either common questions or individual questions by predicting how the parties will prove them at trial.  *Brown*, 817 F.3d at 1234; *see Babineau*, 576 F.3d at 1191 (indicating that courts conducting a predominance inquiry must examine the claims, defenses, relevant facts, and applicable substantive law to determine the degree to which resolution of the class-wide issues will further each individual class member's claim against the defendant).  In this context, an individual question asks whether members of the proposed class will need to present evidence that varies from member to member, whereas a common question asks whether the same evidence will suffice for each member to establish a *prima facie* showing or whether the issue is susceptible to generalized, class-wide proof.  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).  Importantly, "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Id.* at 453-54 (citation and internal quotation marks omitted).  If, however, plaintiffs must still introduce a great deal of individualized proof or argue several legal points to establish most or all of the elements of their individualized claims after adjudication of the class-wide issues, such claims do not warrant class certification under Rule

23(b)(3).  *Vega*, 564 F.3d at 1270 (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004)).

Where common issues predominate over individualized issues, the addition or subtraction of any of the plaintiffs to or from the class should not substantially affect the substance or quantity of evidence offered.  *Vega*, 564 F.3d at 1260 (quoting *Klay*, 382 F.3d at 1255).  Stated differently, individual issues will be deemed important if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, while, on the other hand, common issues will be deemed to predominate if the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs relatively undisturbed.  *Vega*, 564 F.3d at 1260 (quoting *Klay*, 382 F.3d at 1255).  Simply put, the same evidence will suffice for each member for common questions, but evidence will vary from member to member for individual questions.  *Brown*, 817 F.3d at 1234.

The crux of the parties' dispute regarding the propriety of class certification centers upon whether common questions of law and fact predominate over questions affecting individual class members only.  Haines contends they do.  Namely, Haines asserts that the determination of whether Fidelity committed a breach or did not commit a breach will be resolved on a class-wide basis and be conclusive as to all class members.  According to Haines, both parties maintain that Section 9(c)(i) is clear, but they merely offer competing interpretations.  Since the overarching legal question pertains to Haines and all class members, Haines asserts that common issues predominate.  Fidelity contests Haines's predominance

assertions, again highlighting several individual issues it contends predominate, including the need for individualized factfinding to cull a universe of buyers down to potential claimants; for proving Haines's claim elements, especially as to causation and as to the unjust enrichment claim; and for Fidelity's defenses, including the need for individual evidence to overcome the FARBAR's limitation of liability clause,[14] voluntary payment issues,[15] comparative fault issues, and knowledge-based defense issues.

### a.    Breach of Fiduciary Duty

As to the claim for breach of fiduciary duty, Haines failed to establish predominance.  Under Florida law, the elements of a claim for breach of fiduciary duty are: (1) the existence of a fiduciary duty, (2) breach of that duty, and (3) the

---

[14] (*See* Doc. 77, Ex. A, Contract, ¶13) ("… In any proceeding between the Buyer and Seller wherein [Closing Agent or Escrow Agent (collectively, "Agent")] is made a party because of acting as Agent hereunder or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent.  Agent shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to Agent's willful breach of this Contract or Agent's gross negligence.  This paragraph 13 shall survive Closing or termination of this Contract.")).

[15] The parties debate the appropriateness or even availability of the voluntary payment defense, especially given the passage of Section 725.04, Florida Statutes, which states: "When a suit is instituted by a party to a contract to recover a payment made pursuant to the contract and by the terms of the contract there was no enforceable obligation to make the payment or the making of the payment was excused, the defense of voluntary payment may not be interposed by the person receiving payment to defeat recovery of the payment." For purposes of class certification, the undersigned need not determine the viability or merits of the defense.  *See Eisen*, 417 U.S. at 178; *Valley Drug*, 350 F.3d at 1188 n.15; *Hudson*, 90 F.3d at 457 (indicating that the merits of the plaintiffs' claims were not before the court on a motion for class certification and citing a case for the proposition that, in determining the propriety of a class action, the question is not whether the plaintiff states a cause of action or will prevail on the merits but rather whether the plaintiff meets the requirements of Rule 23).

breach is the proximate cause of the plaintiff's damages.  *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla. 2002) (citations omitted).  In characterizing the nature of fiduciaries and their attendant duties, the Florida Supreme Court has indicated:

> [O]ne standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed from the relation.  Thus, a fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act.  The liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation.  Moreover, a fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matter within the scope of that relation.  Florida courts have recognized a cause of action for breach of fiduciary duty.

*Doe v. Evans*, 814 So.2d 370, 374 (Fla. 2002) (internal alterations, internal citations, and internal quotation marks omitted).  In Florida, "[a] fiduciary relationship may be implied by law, and such relationships are premised upon the specific factual situation surrounding the transaction and the relationship of the parties."  *Id.* (citation and internal quotation marks omitted).

Here, Haines argues that Fidelity maintained a contractual, statutory,[16] and common law[17] duty to provide and charge for Closing Services in accordance with the terms of the FARBAR.  Though the issue as to whether Fidelity owed a

---

[16]  *See* Fla. Stat. § 626.8473(2) ("All funds received by a title insurance agent as described in subsection (1) shall be trust funds received in a fiduciary capacity by the title insurance agent and shall be the property of the person or persons entitled thereto.") & (4) ("Funds required to be maintained in escrow trust accounts pursuant to this section shall not be subject to any debts of the title insurance agent and shall be used only in accordance with the terms of the individual, escrow, settlement, or closing instructions under which the funds were accepted.").

[17]  Notably, the Florida Supreme Court has concluded that a closing agent maintains "a duty to supervise the closing in a reasonably prudent manner."  *The Florida Bar v. Hines*, 39 So.3d 1196, 1200 (Fla. 2010) (citation and internal quotation marks omitted).

fiduciary duty to provide and charge for Closing Services in accordance with the terms of the FARBAR would involve common answers demonstrated by common proof, questions regarding whether Fidelity breached such duty as to each potential class member and whether such breach was the proximate cause of any damages to each class member will vary per transaction and thus require individualized inquiries on a claim-by-claim basis.  Indeed, Howe indicated that Fidelity does not maintain written policies regarding the provision of closing services for residential property transactions in Florida or regarding customer complaints about a closing fee, and such issues get handled at the local level rather than uniformly, thereby making the circumstances of each transaction inherently unique (Howe Dep., at 32-33, 96-97; Howe Supp. Decl., ¶7).

Further, given the uniqueness and variability of each transaction, analysis of each claim may require the use of extrinsic evidence.   Where individualized extrinsic evidence bears heavily on the interpretation of the class members' agreements, even the most common contractual questions, such as those arising from the breach of a form contract, may preclude predominance.  *Sacred Heart Health Sys.*, 601 F.3d at 1176-77.  Essentially, each class member in this action would need to prove that, to the extent that Fidelity maintained a fiduciary duty, Fidelity breached that duty in improperly preparing the settlement statement, which caused the class member to pay the challenged CSF.

Even assuming Fidelity owed Haines or class members a fiduciary duty, the essence of Haines's claim is that Fidelity breached that duty by failing to follow the

agreement between a buyer and seller that the seller would pay the entire CSF. Haines's theory presumes that every buyer and seller interpreted Paragraph 9(c)(i) of the FARBAR in conformity with Haines's interpretation. If a buyer and seller interpreted Paragraph 9(c)(i) of the FARBAR the way Fidelity interprets the provision, their meeting of the minds would have a significant impact upon any potential liability for Fidelity. In that regard, the buyer's and seller's state of mind for each transaction are relevant and probative to the determination of breach and causation. To make such a determination, therefore, individualized discovery and factfinding regarding each buyer's and seller's intent and understanding would be required. For example, as Fidelity asserts, some buyers could have received advice from counsel, real estate agents, or others, and such advice would bear upon a buyer's intent or understanding regarding the CSF. Those issues cannot be demonstrated by common proof but instead would result in a series of mini trials for each putative class member on causation, likely involving evidence beyond what Fidelity maintains in its transaction files. Such individualized inquiries related to the elements of class members' claims preclude a finding of predominance. *See, e.g., Foster v. Green Tree Servicing, LLC*, Case No: 8:15-cv-1878-T-27MAP, 2017 WL 5508371, at *5 (M.D. Fla. Nov. 15, 2017) (finding that individualized inquiries required to establish proposed class members' claims and the defendant's defenses precluded a finding of predominance and accordingly denying class certification); *Justice v. Rheem Mfg. Co.*, 318 F.R.D. 687, 697 (S.D. Fla. 2016) (finding that the causation element of a FDUTPA claim appeared to involve individualized inquiry,

thereby precluding a finding of predominance and cutting against class certification); *Lankford v. Carnival Corp.*, CASE NO. 12-24408-CIV-ALTONAGA/O'Sullivan, 2014 WL 11878384, at *10 (S.D. Fla. July 25, 2014) (finding that specific determinations of proximate causation would predominate over a class-wide determination of negligence).

Similarly, a buyer's and seller's intent and understanding are relevant to Fidelity's defenses and would require individualized inquiries, also precluding a finding of predominance. *See Foster*, 2017 WL 5508371, at *5. For instance, Fidelity contends that several class members' claims may be subject to knowledge-based defenses, such as voluntary payment, waiver, or estoppel. "A plaintiff may claim that every putative class member was harmed by the defendant's conduct, but if fewer than all of the class members enjoyed the legal right that the defendant allegedly infringed, or if the defendant has non-frivolous defenses to liability that are unique to individual class members, any common questions may well be submerged by individual ones." *Sacred Heart Health Sys.*, 601 F.3d at 1170. In the matter at hand, Fidelity's defenses to liability, while potentially presenting some overlap among class members, require an individual assessment for each class member. Knowledge or voluntary payment by class members simply cannot be demonstrated through common proof. The individualized assessments required for Fidelity to defend against each of the class members' claims thus further militates against a finding of predominance.

Fidelity additionally argues that the FARBAR's limitation of liability clause

requires a showing of willfulness or gross negligence on the part of Fidelity (*see* Doc. 77, Ex. A, Contract, ¶13 ("Agent shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to *Agent's willful breach of this Contract or Agent's gross negligence*.") (emphasis added)). As indicated, the allocation and charging of the CSFs do not occur routinely by every closing agent employed by Fidelity or pursuant to any verbal or written policy or procedure (Howe Dep., at 32-33, 96-97). The demonstration of willfulness or gross negligence on the part of Fidelity therefore could not be demonstrated through common proof.

Lastly, "if damages across the class cannot be computed 'according to some formula, statistical analysis, or other easy or essentially mechanical method[,]'" that issue may also prove sufficient to preclude a finding of predominance. *Mills v. Foremost Ins. Co.*, 269 F.R.D. 663, 676 (M.D. Fla. 2010) (quoting *Sacred Heart Health Sys.*, 601 F.3d at 1179). Nothing in the record indicates that Fidelity charged a flat fee for a CSF or that a formula, statistical analysis, or other mechanical method may be used to ascertain damages as to each class member. Rather, as Fidelity contends, each real estate transaction is unique and may include, for example, an agreement between the buyer and seller to split the closing fees or an agreement with a real estate agent or other advisor to split or reduce the closing fees, the details of which may appear in the transaction file or may remain separate and apart from the transaction file (Doc. 83, Declaration of Barbara Mott Howe in Support of Defendant Fidelity National Title of Florida, Inc.'s Opposition to Plaintiff Haines' Motion for Class Certification ("Howe Supp. Decl."), ¶¶7, 13, 15). On this record,

it appears that damages present yet another individualized inquiry. Accordingly, given that individualized inquiries regarding the elements of the claim, the defenses, and the damages predominate over any issues common to the class, Haines failed to establish predominance as to the claim for breach of fiduciary duty.

### b.      Unjust Enrichment

Alternatively, Haines moves for class certification on the unjust enrichment claim. "A claim for unjust enrichment is an equitable claim, based on a legal fiction created by courts to imply a 'contract' as a matter of law." *Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 805 (11th Cir. 1999). To state a claim for unjust enrichment in Florida, the plaintiff must show: "(1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Vega*, 564 F.3d at 1274 (citations and quotation marks omitted); *see also Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) ("A claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof.") (citations omitted).

With respect to the unjust enrichment claim, Haines likewise failed to establish predominance because individualized facts will prove determinative. As the Eleventh Circuit acknowledged in *Vega*, "common questions will rarely, if ever,

predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Vega*, 564 F.3d at 1274.  Before a court can grant relief on a claim for unjust enrichment, it "must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist." *Id.*  In *Vega*, the Eleventh Circuit concluded that, because of the necessary inquiry into the individualized equities attendant to each class member, courts, including the Eleventh Circuit, generally find unjust enrichment claims inappropriate for class action treatment.  *Vega*, 564 F.3d at 1274.

Notwithstanding, unjust enrichment claims can be certified for class treatment if common circumstances bear on whether the defendant's retention of a benefit received from class members was just or not.  *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 657 (S.D. Fla. 2012) (citation omitted).  As such, nothing precludes a court from certifying an unjust enrichment claim for class-action treatment where the appropriate situation arises.  *James D. Hinson Elec. Contracting Co., Inc. v. BellSouth Telecomms., Inc.*, 275 F.R.D. 638, 647 (M.D. Fla. 2011) ("Although unjust enrichment ordinarily requires individualized inquiries, this is not an ordinary case. … BellSouth's conduct was the same with regard to each class member in all relevant respects.  The issue of whether it is equitable for BellSouth to retain the full amount of its bills when such amounts exceeded what BellSouth could recover in an action at law thus appears to be subject to common proof."); *Cnty. of Monroe, Fla. v. Priceline.com, Inc.*, 265 F.R.D. 659, 671 (S.D. Fla. 2010) ("While this is undoubtedly true in most cases, the Eleventh Circuit's underlying

concern is that unjust enrichment claims typically require individualized inquiries into the equities of each class member's interaction with each defendant. ... This concern, however, is not present here.  As discussed above it is undisputed that Defendants' business operations are the same as to all members of the putative class. Given this fact, it is difficult to conceive of any significant equitable differences between class members, and Defendants do not suggest any.  Accordingly, the County's unjust enrichment claim does not preclude a finding of predominance.") (footnote omitted); *Veal v. Crown Auto Dealerships, Inc.*, 236 F.R.D. 572, 581 (M.D. Fla. 2006) (finding that the issues relevant to the plaintiff's unjust enrichment claim were susceptible to proof using common generalized evidence, including as to the common issues of whether (1) the defendant's deceptive and unfair trade practices regarding the sale of a product resulted in it receiving income; (2) whether the income enriched the defendant at the expense of the class members; and (3) whether as a matter of equity, the defendant should be required to return the profits to the class members).  Namely, "when the defendant's conduct is the same, 'it is difficult to conceive of any significant equitable differences between class members.'" *James D. Hinson Elec. Contracting*, 275 F.R.D. at 647 (quoting *Cnty. of Monroe*, 265 F.R.D. at 671).

This action does not present a claim for unjust enrichment ripe for class treatment.  Specifically, the claims in this action do not involve uniform charges equally applied to all putative class members as part of a policy or practice in every real estate transaction where Fidelity provided Closing Services in Florida during

the applicable period such that a determination can be made as to whether Fidelity was unjustly enriched in every transaction. Instead, the claims involve individualized inquiries required to determine (1) whether Fidelity appreciated the benefit as anything other than proper payment for its services and (2) whether Fidelity's acceptance and retention of the CSF occurred under circumstances that made it inequitable for Fidelity to retain the CSF. For example, "'[w]hen a defendant has given adequate consideration to someone for the benefit conferred, a claim of unjust enrichment fails.'" *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 n.3 (11th Cir. 2011) (quoting *Am. Safety Ins. Serv., Inc. v. Griggs*, 959 So.2d 322, 331-32 (Fla. Dist. Ct. App. 2007)). To the extent that Fidelity provided adequate consideration for the fee allocated and charged to a particular class member, such claim would fail. That determination cannot be made on a class-wide basis but must be addressed through an individualized inquiry for each class member. Moreover, as discussed above, the same individualized issues regarding Fidelity's defenses to the breach of fiduciary duty claim apply equally to Fidelity's defenses to the unjust enrichment claim. *See, generally, Justice*, 318 F.R.D. at 698 (finding that class certification should be denied with respect to an unjust enrichment claim considering the Eleventh Circuit's statements in *Vega* and given the denial of certification for the reasons articulated on the other proposed class claim). For these reasons, Haines failed to establish predominance as to the unjust enrichment claim. Since Haines cannot establish predominance on either claim, certification of the class is inappropriate.

ii.     Superiority[18]

For the final part of the analysis, Haines must establish that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  The superiority analysis focuses upon the relative advantages of proceeding as a class action suit over any other forms of litigation that might be realistically available to a moving party.  *Sacred Heart Health Sys.*, 601 F.3d at 1183-84.  As noted, in determining the superiority of the class action, the court may consider (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).  The district court should also consider its predominance analysis in determining whether a class action provides the superior mechanism for adjudicating the claims, as a finding of predominance tends to indicate superiority while a lack of predominance effectively ensures a lack of superiority.  *Sacred Heart Health Sys.*, 601 F.3d at 1184 ("[T]he predominance analysis has a tremendous impact on the superiority analysis for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs'

---

[18]  Even though the predominance inquiry dooms Haines's request for class certification, the undersigned will continue with the analysis, as it is presented on report and recommendation to the District Judge.

50

claims both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability.") (internal quotations, internal citations, and internal alterations omitted); *Vega*, 564 F.3d at 1278 n.18 (noting that a lack of predominance effectively ensures, as a substantive matter, a lack of superiority); *Jackson*, 130 F.3d at 1006 n.12 ("The predominance and efficiency criteria are of course intertwined.  When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class."); *Clausnitzer v. Fed. Express Corp.*, 248 F.R.D. 647, 662 (S.D. Fla. 2008) ("In light of the determination that individual issues of law and fact predominate over issues common among class members, the class procedure is not superior to other methods of adjudication.").

In this instance, Haines asserts that, given the large number of purported class members, the similarity of the claims of all class members, and the relatively small potential recovery in individual suits, proceeding as a class action is superior to any other forms of litigation.  Furthermore, according to Haines, nothing indicates that any class members maintain an interest in individually controlling the prosecution or defense of separate actions, especially given the potential recovery of less than $500 for most class members as compared to the costs associated with litigation of each individual's claim, or that any class member in fact already initiated or intends to initiate a lawsuit to pursue his or her individual claims against Fidelity. Regarding the forum, Haines argues that litigation in this forum is superior given that Fidelity is based in Florida and all the transactions at issue occurred in Florida.

Moreover, Haines contends that handling this matter as a class action would prove less difficult than handling potentially more than 8,000 individual lawsuits, particularly where all class members' claims involve common issues of fact and law, the resolution of which will involve common proof.

As Haines contends, some considerations weigh in favor of proceeding as a class action. First, nothing in the record indicates that any other cases have been filed by potential class members. Further, as Haines posits, the relatively small potential recovery for each class member weighs in favor of proceeding as a class action because the individual claims may prove too small and provide little incentive for a separate action by each class member. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 989 (11th Cir. 2016) ("As the district court noted, individual claims may be too small for a separate action by each class member. Because common questions of law and fact predominate, class-wide adjudication appropriately conserves judicial resources and advances society's interests in judicial efficiency."); *see Lyttle*, 2021 WL 3602996 (concluding that a plaintiff established superiority considering, among other factors, that each individual claim was likely modest and that individual class members would likely not have an interest in instituting a lawsuit or in controlling their own individual actions). Additionally, concentrating the litigation in this forum would make sense since Haines resides in Pinellas County, Fidelity is registered as a Florida corporation, and the proposed class comprises buyers involved in real estate transactions in Florida. If the analysis stopped there, perhaps Haines would receive a favorable superiority finding.

The analysis continues, however, and the remaining considerations demonstrate that a class action would not provide the superior mechanism for adjudication of the claims.   Fundamentally, Haines failed to establish predominance.   Given the lack of predominance of issues common to class members over individualized issues, proceeding as a class action will not provide the most efficient and least onerous means of adjudicating Haines's and the class members' claims.  *See Sacred Heart Health Sys.*, 601 F.3d at 1184; *Vega*, 564 F.3d at 1278 n.18; *Jackson*, 130 F.3d at 1006 n.12; *Clausnitzer*, 248 F.R.D. at 662. Proceeding as a class action is thus unwarranted on that basis alone.

Even so, the other pertinent question regarding superiority in this action relates to the question of manageability.   While reiterating its position that predominant individual issues abound, thus defeating superiority, Fidelity focuses its remaining argument against superiority mainly upon the manageability of proceeding as a class action.  As indicated above, considerations of administrative feasibility remain relevant to the Rule 23(b) analysis, considering the manageability criterion set forth in Rule 23(b)(3)(D).   *Cherry*, 986 F.3d at 1303.   Primarily, a superiority determination asks whether a class action is better than other available methods of adjudication, (1) comparing if a class action would create more manageability problems than its alternatives, and (2) assessing how the manageability concerns compare with the other advantages or disadvantages of a class action.  *Id.* at 1304-05.

In making this determination, district courts must initially balance

manageability considerations against other considerations.  *Id.* at 1304.  Notably, the balancing test required under Rule 23(b)(3)(D) does not allow district courts to make administrative feasibility a requirement, as the manageability inquiry focuses not upon whether the class action will create manageability problems in an absolute sense but rather whether a class action will create relatively more management problems than any of the alternatives.  *Cherry*, 986 F.3d at 1303-04*.*  Accordingly, administrative difficulties, whether involving in-class member identification or otherwise, do not alone doom a motion for certification, as manageability issues will rarely, if ever, be in themselves sufficient to prevent class certification.  *Id.* at 1304.  If a district court determines that unusually difficult manageability problems exist, however, the court may insist on details of the plaintiff's plan for notifying the class and managing the action.  *Id.*  Further, even if the district court certifies the class and later concludes that manageability issues exist, the court retains discretion to decertify such a certified class that proves unmanageable.  *Id.*

Here, a class action would create more manageability problems than its alternatives, and the manageability concerns do not compare favorably with the advantages of a class action.  *See Cherry*, 986 F.3d at 1304-05.  Fidelity has already identified the potential real estate transactions that may fall within the class, which includes more than 25,000 transaction files.  As stated above, during discovery, Haines conducted a sampling of Fidelity's transaction files to approximate the total number of potential class members, which it estimated reduced the number of potential class members to 8,437 transactions, or about one third of all transactions

identified by Fidelity (McVoy Report, at 2-10; Class Counsel Decl., ¶¶20-34).   In

conducting the sampling, McVoy described the process of identifying potential class

members as follows:

> Fidelity produced the sample transaction files identified on the
> Random Sample List from its business records. Using Relativity's
> software, Meta-e was able to organize and compile all documents
> produced by Fidelity by transaction file number (or Order Number),
> and then using automated query functions, identify all purchase
> contracts associated with each transaction.
> [Haines's] counsel then manually reviewed each purchase
> contract to determine whether a FARBAR Contract was used,
> whether it was an all-cash transaction, whether 9(c)(i) was selected by
> the parties, and whether any additional terms or amendments to the
> FARBAR Contract was agreed to by the parties regarding the payment
> of fees for closing services.
> After each sample transaction file produced and purchase
> contract was reviewed and tagged for potential class membership,
> [Haines's] counsel then performed a review of the Settlement
> Statement for each relevant purchase contract to confirm if a closing
> service fee was charged to the Buyer.  Each Settlement Statement and
> FARBAR Contract was then tagged for relevance.

(McVoy Report, at 8; *see* Class Counsel Decl., ¶¶21-28).  Each tagged transaction

identified a potential class member, which allowed Relativity to generate a Sample

Class List that identified all transactions from the Random Sample List involving a

potential class member (McVoy Report, at 9).  McVoy opined that, upon class

notice, a claims administrator, Haines's counsel, or Fidelity could likewise use

Relativity's query and tagging functions to confirm class membership by reviewing

the purchase contract and settlement statement for any class member who submits

a claim (McVoy Report, at 9).

In support of its manageability argument, Fidelity offered deposition

testimony and a declaration from Jacob Ancona, Fidelity's litigation support

manager, e-discovery and legal hold counsel, and Deputy Director of Information Governance, regarding the feasibility of searching and producing transaction files in Fidelity's system (Doc. 77, Ex. C, Deposition of Jacob Ancona ("Ancona Dep."); Doc. 84, Declaration of Jacob Ancona ("Ancona Decl.")).   Ancona described Fidelity's transaction file system and retrieval capabilities as follows:

5.     Fidelity utilizes a proprietary document repository for all title and escrow transactions known as SmartView.   SmartView is the official system of record for all title and escrow files.

6.     SmartView is used throughout the course of each transaction to store and transmit documents pertaining to each individual title and escrow file.

7.     SmartView can be queried by order number or property address to return potentially matching transactions.

8.     SmartView cannot be queried in bulk, nor can files or documents be pulled in bulk.   Only a single file can be opened or downloaded at a time.

9.     When searching for any particular document, each file must be manually located, and the documents within each file must be individually downloaded and reviewed in order to determine whether any file or document is the document sought.   Documents within SmartView are not text searchable, nor can they be viewed directly within the system.

10.     In order to locate a particular file in SmartView, an order number or property address would be queried, and results returned. SmartView contains transactions from all FNF operations across all 50 states.   Often, multiple files can be returned during a single search requiring a review of those results to determine which one is the actual file being sought.

11.     Once a file is identified, in order to determine its contents, a user would need to navigate to the document page and either download the entire file, or transfer and process the file into our review and production tool, Relativity, wherein the meta-data would be extracted and documents would become text searchable.   Or the user could

attempt to identify documents being sought within SmartView and only download the potentially responsive, individual documents for further review.

(Ancona Decl., ¶¶5-11). Ancona opined that it could take anywhere from two minutes, under perfect circumstances, to sixty minutes to identify, locate, retrieve, and review each transaction file (Ancona Dep., at 50-54; Ancona Decl., ¶¶22-23). According to Ancona, Fidelity employs five individuals who work with Ancona, including an attorney, a paralegal, a lead discovery specialist, and two information technology employees, who could assist with the search and production of the transaction files (Ancona Dep., at 62). By his estimation, assuming a review team of five individuals and 25,000 transaction files, it would take approximately 5,000 hours for each individual (25,000 hours total) or about 2.5 years each to identify documents prior to any resolution of disagreement or judgment calls (Ancona Decl., ¶23). Further, with respect to the sampling and narrowing process employed by Haines and Meta-e, Ancona highlighted several issues, including that some of the search terms would return substantially more results than identified by Haines, some judgment calls would be necessary to determine which document constituted a final statement, some sample class transaction files demonstrated that buyers agreed to pay part of the title costs, and some sample class transaction files either did not include a settlement statement or included an unsigned settlement statement (Ancona Decl., ¶¶17-21; Doc. 85, Declaration of Mary Ellen R. Himes ("Himes Decl."), Ex. J-N).

Whether it takes two or sixty minutes per transaction file, the multi-layered

review process of the transaction files will nonetheless require a significant amount of time and effort to distill the total number of possible class members down from the 25,187 transaction files, many of which may include hundreds of pages. Such effort calls into question whether proceeding as a class action presents manageability issues. *See, generally, Mills*, 269 F.R.D. at 678-80. Each transaction file requires individualized review, and, even after the individualized review is conducted and the total transaction files are reduced to potential class members, the presence of individualized issues, such as modifications, written or oral, and knowledge-based defenses, would need to be addressed individually. Under these circumstances, proceeding as a class action would not prove superior.

Beyond that, Fidelity argues that, though the alternative to certification may be no lawsuits at all, the Court should not base the superiority analysis on speculation regarding whether all or any other potential class members will pursue remedies. Fidelity states that, "[i]n comparison with the number of transactions closed by Fidelity, very few people have complained about the closing fee or requested a refund" (Howe Supp. Decl., ¶16). In fact, Fidelity acknowledges that some individuals have already complained about closing fees and requested a refund and that, in instances where Fidelity received complaints about a closing fee, Fidelity agreed to reduce or waive a closing fee (Howe Supp. Decl., ¶16; Howe Dep., at 96-99).[19] Fidelity believes that satisfied buyers who agreed to pay the fee

---

[19] To reiterate, Fidelity does not maintain written policies regarding how it expects closing services to be provided for residential property transactions in Florida or for when a customer complains about a closing fee, and such issues get handled at the local level rather

would not sue, and even dissatisfied customers would not necessarily sue given Fidelity's customer service practices, including issuing refunds.   According to Fidelity, some buyers may also seek reimbursement from sellers or advisors who counseled them during the real estate transaction, but for those buyers who seek to institute individual actions, such individual actions would require individualized discovery and factfinding necessary to afford due process to Fidelity and would yield greater relief since the relief would not be diluted by attorneys' fees and administrative costs inherent in a class action.   Fidelity's arguments are well-taken.[20]   Weighing the issues regarding manageability against other factors, therefore, the balance does not tip in favor of a class action.

To summarize, proceeding as a class action will not provide the superior mechanism for adjudicating the claims in this action.   Based on the foregoing considerations, Haines failed to establish that proceeding as a class action is superior to other methods available to fairly and efficiently adjudicate this controversy, especially since individualized inquiries predominate.   As Haines failed to satisfy

---

than uniformly, so the circumstances of each transaction are unique (Howe Dep., at 32-33, 96-97).

[20]   Fidelity also suggests that revision of the FARBAR to eliminate any perceived disconnect between the language contained therein and agreements for payment of fees and costs customarily charged to buyers by closing agents provides a superior alternative to a class action.   To the extent that a revision is needed, Fidelity argues that the drafters of the FARBAR should address the issue, not a class in this action.   This argument misses the mark.   The FARBAR, as drafted during the applicable period, remains at issue, and no one seeks to revise the contents of that form contract individually or on a class-wide basis. Rather, Haines seeks to enforce the terms of the agreement with Fidelity regarding the performance of Closing Services, which he asserts required compliance with the provisions of the applicable FARBAR.   Accordingly, the undersigned does not find this argument availing or particularly relevant to the analysis.

the requirements of Rule 23(b)(3), class certification is unwarranted.

**IV.   Conclusion**

For the foregoing reasons, it is hereby

RECOMMENDED:

1.      Haines's Motion for Class Certification (Doc. 77) be denied.

IT IS SO REPORTED in Tampa, Florida, on this 17th day of February, 2022.

ANTHONY E. PORCELLI
United States Magistrate Judge

**NOTICE TO PARTIES**

A party has fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections.  28 U.S.C. § 636(b)(1)(C).  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  See 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).  **Should the parties wish to expedite the resolution of this matter, they may promptly file a joint notice of no objection.**

cc:    Hon. Kathryn Kimball Mizelle
        Counsel of Record